IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JANET P.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-00024 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Janet P. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is

before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative

record, the parties' filings and oral arguments, and the applicable law, I cannot find that the

Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully

recommend that the decision be reversed and the case remanded under the fourth sentence of 42

U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for former Commissioner Andrew M. Saul as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Janet applied for DIB on July 3, 2014, alleging disability because of arthritis, colitis, ankle joint necrosis, neuropathy, nerve pain, degenerative disc disease, sleep apnea, psoriasis, and "need[ing] both knees replaced." Administrative Record ("R.") 109, 291–92, ECF No. 5. She alleged that she became disabled on June 30, 2014. *Id.* She was fifty-five years old, or a person of "advanced age" under the regulations, on her alleged onset date. R. 109; 20 C.F.R. § 404.1563(e). Disability Determination Services ("DDS"), the state agency, denied her claim initially in November 2014, R. 108–118, and upon reconsideration in May 2015, R. 119–31. In January 2017, ALJ Marc Mates issued an unfavorable decision after a hearing at which Janet appeared with counsel and testified. R. 132–45. Janet appealed the decision to the Appeals Council, and in January 2018 the Appeals Council vacated ALJ Mates's decision and remanded the case for consideration of new medical evidence showing that Janet "had exhausted conservative methods for treatment of her bilateral knee pain and was to undergo total knee arthroplasty" shortly after ALJ Mates issued his decision. R. 152 ("There is a reasonable probability that the additional evidence would change the outcome of the decision."). That

3

December, Janet appeared with counsel and testified at an administrative hearing before ALJ H.

Munday. *See* R. 76–101. A vocational expert ("VE") also testified at the hearing. R. 102–06.

ALJ Munday issued a partially favorable decision on March 13, 2019. R. 14–24. First,

ALJ Munday found that Janet had not engaged in substantial gainful activity since her alleged

onset date. R. 16. At step two, ALJ Munday found that Janet had four severe impairments:

degenerative joint disease of the knees, degenerative disc disease, hypertension, and obesity. R.

17. At step three, she concluded that none of Janet's impairments, considered both alone and in

combination, met or equaled any relevant Listing. R. 18–19 (citing 20 C.F.R. pt. 404, subpt. P,

app. 1 §§ 1.02, 1.04). ALJ Munday then evaluated Janet's residual functional capacity ("RFC").

R. 19–22. She determined that "prior to May 5, 2016, the date [Janet] became disabled," Janet

could perform "light"[4] work with additional limitations. R. 19–21. She could occasionally

balance, stoop, kneel, crouch, and climb ramps/stairs; she could never crawl or climb

ladders/ropes/scaffolds; she could occasionally perform pushing/pulling activities with her

bilateral lower extremities; and she could have occasional exposure to vibrations and hazardous

conditions. R. 19. "[B]eginning on May 5, 2016," however, Janet was limited to "sedentary"[5]

work with the same nonexertional restrictions. R. 21.

Based on these RFC findings and the VE's testimony, ALJ Munday concluded that

before May 5, 2016, Janet could return to her past relevant work as a school nurse and was thus

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

[5] "Sedentary" work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledges, and small tools." 20 C.F.R. § 404.1567(a). "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96–9p, 1996 WL 374185, at *3. The "majority of individuals . . . age 50 or older" limited to sedentary work will be presumed disabled. *Id.*; *see* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00.

"not disabled" from her alleged onset date through May 4, 2016. R. 22–24. She also concluded

that as of May 5, 2016, Janet could no longer perform her past relevant work and was "disabled"

under the Medical-Vocational Rules. R. 23–24 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §

201.06). Janet asked the Appeals Council to review ALJ Munday's decision, and the Appeals

Council denied her request, thereby making ALJ Munday's March 2019 written decision "the

final decision of the Commissioner" denying Janet's DIB claim. R. 1–3.

### III. Discussion

Janet raises three challenges to ALJ Munday's RFC assessment. *See generally* Pl.'s Br.

12–19, ECF No. 9. She argues that ALJ Munday (1) failed to adequately explain why she found

Janet capable of "light" work before May 5, 2016, but then limited her to "sedentary" work as of

May 5, 2016, *id.* at 14–16; (2) improperly rejected one of the DDS physicians' opinions, *id.*; and

(3) failed to properly evaluate how Janet's combination of impairments impacted her functional

abilities, *id.* at 17–19. Janet's first argument is persuasive.

A.    *Summary*

1.    *Relevant Medical Evidence*[6]

In August 2013, Janet visited John McCue, D.O., at Mountainside Medicine, complaining

of persistent and severe leg pain and left neck and trapezius pain. R. 500–01. Dr. McCue

observed neck degenerative joint disease ("DJD") and back, neck, and trapezius pain/spasms. R.

502; *see also* R. 504, 507 (observing same through March 2014). He diagnosed a herniated

lumbar disc and radicular spinal pain, and he prescribed Lyrica and naproxen. R. 502.

---

[6] In support of her argument that ALJ Munday's selection of May 5, 2016 as the date Janet became
disabled was arbitrary, Plaintiff cites medical evidence documenting impairments in her legs, back, and
neck. *See* Pl.'s Br. 15–16. Accordingly, I summarize the evidence pertaining to those impairments and do
not include treatment notes pertaining to other medical issues.

In June 2014, Janet presented to Brian Subach, M.D., at the Virginia Spine Institute, complaining of leg and back pain. R. 439. She explained that pain and numbness in her left leg had worsened over the "past couple of months," involved her "whole leg," increased with prolonged standing, and decreased with sitting in her recliner. *Id.* Dr. Subach observed a normal gait; diffuse lumbar and facet joint tenderness; limited lumbar range of motion ("ROM"); 1/4 patellar and achilles reflexes bilaterally; full lumbar strength; negative straight leg raises; and no lower extremity tenderness. R. 439–40. He diagnosed lumbar segmental instability, lumbar spondylosis without myelopathy, and lumbar radiculitis; and he recommended an MRI, a lower extremity electromyography ("EMG"), physical therapy,[7] and a possible spinal cord stimulator. R. 441. X-Rays revealed "[d]ecreased disc space . . . at L3/4, L4/5, and L5/S1, with near complete loss of disc height at both L4/5 and L5/S1," R. 443, and the MRI showed "[m]ultilevel degenerative disk disease . . . particularly involving the L4-L5 and L5-S1 levels, but also seen on a limited basis at T10-T11 and T11-T12," R. 445.

Later in June, Janet returned to Dr. McCue, reporting that her left knee pain and left lower extremity radiculopathy were "causing major problems," such that standing and daily activities were "problematic." R. 509. Dr. McCue observed back pain and spasms, neck DJD, and neck and trapezius spasms. R. 511. He diagnosed knee effusion, a herniated lumbar disc, and radicular spinal pain. *Id.* In early July, an abnormal EMG study showed "moderate chronic denervation of the left L5 and S1 nerve root innervated muscles," which was "consistent with a moderate left chronic L5 and S1 radiculopathy." R. 448. The study was "unchanged" from a prior EMG in 2007, and it showed "no evidence" of plexopathy, myopathy, or lower limb acute

---

[7] Janet participated in physical therapy from June 2014 through August 2014. *See, e.g.*, R. 459, 462, 468, 472, 473, 494, 660. In August 2014, she was discharged from physical therapy. R. 459. Her therapist noted that she had made "[l]ittle to no progress [with] PT" and had not been compliant with her home exercise plan. *Id.* He also noted that Janet was limited secondary to increased bilateral knee osteoarthritis and knee pain. *Id.*

denervation. *Id.* Further, all nerve conduction velocity ("NCV") studies were "within normal limits." *Id.* On exam, Janet had full lower limb strength, intact sensation and distal extremity pulses, negative straight leg raises bilaterally, and 1/4 achilles and patellar reflexes bilaterally. R. 449. A week later, a left knee X-Ray showed "[t]ricompartmental and tibiofibular osteoarthritis and small suprapatellar joint effusion." R. 481.

In July, Janet returned to Dr. Subach, reporting left knee pain. *See* R. 454–55. Dr. Subach noted that her recent X-Ray showed "degenerative changes of the left knee" and that her EMG "revealed stable chronic left L5 and S1 radiculopathies." R. 454. He also observed negative straight leg raises, "visible" left knee joint swelling, left suprapatellar tendon tenderness, and no right knee tenderness. *Id.* He diagnosed knee DJD, lumbar radiculitis, lumbar spondylosis without myelopathy, and adult degenerative scoliosis; he explained that Janet's "primary symptoms appear[ed] related to local joint disease of the left knee"; and he ordered an orthopedic evaluation. R. 455. In August, Janet returned to Dr. McCue, reporting that her left knee pain and left lower extremity radiculopathy were "still problematic." R. 512. She also had right ankle pain and reported difficulty with standing and daily activities. *Id.* Dr. McCue observed neck DJD and back and leg spasms/pain, and he assessed lower leg joint pain and radicular spinal pain. R. 513.

In November, Janet presented to C. Anderson Engh, Jr., M.D., at Anderson Orthopaedic Clinic for a knee evaluation. R. 537–41. She reported five to six months of "worsening left greater than right knee pain," most of which was "in the anterior aspect of the left knee without radiation." R. 537. In particular, she had pain when going up and down stairs, getting in and out of a car, walking five to six blocks, and standing for long periods of time. *Id.* Dr. Engh observed a "wide-based antalgic gait," 10 to 110 degree ROM in the left knee, 0 to 122 degree ROM in the right knee, and palpable effusion intra-articularly in the left knee joint. R. 539. Accordingly, he

diagnosed degenerative arthritis of the knees, identifying "grade 4" changes in the left knee and "grade 3" changes in the right knee. R. 539–40. Finally, he explained that Janet needed a "left total knee replacement." R. 540. The record does not reflect that Janet returned to Dr. Engh, and later medical records suggest that she was unable to afford visits to his clinic because it would not accept her insurance. *See* R. 721.

In December 2014, Janet returned to Dr. McCue. R. 617–18. She stated that she wanted to change pain doctors because, although she was "very happy with the Reston Spinal Institute," she could not "afford the 1200 dollars for the nerve stimulator."[8] R. 618. Dr. McCue observed right ankle stiffness and soreness; neck DJD; and neck, rhomboid, and back pain/spasms. R. 619. Next, in January 2015, Janet presented to Daniel Halpert, D.O., at Advanced Medical Sports and Spine, reporting "neck, upper back, lower back, left leg, both knees, right ankle, and butt pain" that was "radiating and travel[ed] down [her] left leg and both arms." R. 559. Dr. Halpert observed full muscle strength, 1/4 patellar reflexes bilaterally, and 0/4 achilles reflexes bilaterally. R. 560–61. He diagnosed chronic diffuse myofascial pain syndrome, told Janet to continue Lyrica because it was helping, and prescribed amitriptyline. *Id.*

The next day, Janet began treatment with Larry Stephenson, M.D., at Fauquier Neurological Associates. R. 575–76. Dr. Stephenson observed grossly intact motor strength in the legs, a positive Romberg test, a negative straight leg raise test on the right, and a positive straight leg raise test "at 60 degrees" on the left. R. 576. He also concluded that Janet had right greater than left deep tendon reflexes. *Id.* In March, Janet returned to Dr. McCue, reporting that she was still having neck, upper back, and knee pain. R. 623. Dr. McCue observed right ankle stiffness and soreness; neck DJD; and neck, back, and rhomboid pain/spasms. R. 624.

---

[8] Dr. McCue's reference to the "Reston Spinal Institute" in this treatment note likely refers to the Virginia Spine Institute in Reston, Virginia, R. 438, where Janet treated with Dr. Subach. Dr. Subach recommended a spinal cord stimulator as one potential treatment in June 2014. *See* R. 441.

In April, Janet returned to Dr. Stephenson, expressed concern about psoriatic arthritis, and requested a rheumatology referral. R. 725. Dr. Stephenson noted "symptoms of numbness in the arms" and "pain down from the neck into the supraspinatus region and into the shoulder," and he observed a "strongly positive Tinel's sign bilaterally" and tenderness in the cervical and supraspinatus regions. *Id.* He also noted that Janet felt "unbalanced" when walking, and he observed "normoactive" lower extremity reflexes. *Id.* He recommended an upper extremity EMG/NCV study, a cervical MRI, and referral to a rheumatologist. *Id.* In May, Janet saw Dr. Stephenson again, reporting "tiredness in the legs without significant numbness, low back pain, cervical pain and paresthesias in the hands and arms." R. 724. Dr. Stephenson noted "some generalized mild weakness proximally more so than distally in the lower extremities," and he observed that Janet's "[r]eflexes interestingly [were] not hyperactive in the lower extremities despite the stenosis of the cervical C5-6-[C]6-7 area." *Id.* (explaining that her "knee jerks" were "-2," her "ankle jerks" were "3," and her toes were "down going").

In June 2015, Janet returned to Dr. Subach for "cervical surgical treatment options." R. 667. She reported recent falls, balance problems, issues with dropping items, and "total body pain and arm/leg weakness." *Id.* Dr. Subach observed paraspinal muscle and C5-C6 and C6-C7 facet joint tenderness; positive Hoffman's sign bilaterally; good strength throughout the upper extremities; cervical extension of ten degrees with pain; intact upper extremity sensation to light touch; 2/4 patellar and achilles reflexes bilaterally; 5/5 quadricep strength bilaterally with knee pain; and 4/5 EHL, tibialis anterior, and iliopsoas strength bilaterally. R. 667–68. He diagnosed cervical spondylosis with myelopathy, cervical spinal stenosis, cervical radiculitis, cervical disc degeneration, and ataxia; and he determined that, given evidence of "complete collapse and severe central stenosis," Janet needed neck surgery "as soon as feasible" in order to "restore disc

9

height, remove pressure from her spinal cord and stabilize[] her neck." R. 668; *see* R. 669

(noting that the "signs and symptoms of myelopathy" included "heaviness of arms or legs" and

"decreased dexterity"). Janet had neck surgery in July 2015. R. 704.

In September, Janet returned to Dr. Stephenson, who noted that she "seem[ed] to have

come through the cervical surgery quite well," that she "ha[d] no other major problems but d[id]

continue to have some leg pain," and that she had tenderness in the left sacroiliac region. R. 723.

He provided chlorzoxazone samples for muscle spasms and found that Janet still "may very well

need to have lumbar surgery." *Id.* Two weeks later, Janet reported to Dr. McCue that her neck

pain was "still problematic" despite her recent surgery. R. 736. Dr. McCue observed right ankle

stiffness and soreness; neck DJD; and neck, back, and rhomboid pain/spasms. R. 737. He

diagnosed a herniated lumbar disk and cervical and lumbar disk disease, and he prescribed Norco

for pain and Lorzone for muscle spasms. R. 737–38.

In December, Janet saw Justin Smith, M.D., at the University of Virginia's ("UVA")

Neurosurgical Spine Clinic for a post-operative visit. R. 692–93. Her "main complaint [was]

lumbar foraminal stenosis causing lower extremity radiculopathy." R. 693; *see also* R. 692

(noting that her pain was more significant in her legs than in her back). Nothing had helped her

back or leg pain "effectively." R. 692. Dr. Smith noted that although Janet's "lower extremity

symptoms were somewhat better after her neck surgery," she said they had since "returned with a

vengeance." *Id.* He observed full muscle strength, except "4/5 left hip flexion and pain limited

4+/5 left knee extension"; intact sensation to light touch; symmetric reflexes; down going toes;

no tenderness over her midline bony spine; no gross sagittal or coronal imbalance; and a steady,

but antalgic gait. *Id.* He also reviewed her recent imaging results and concluded that they did not

"dictacte[] emergent or urgent intervention." R. 693. He gave Janet lumbar surgical options to

10

consider. *Id.* In February 2016, Janet returned to Dr. McCue, who observed right ankle stiffness

and soreness, neck DJD, and lumbar pain/spasms. R. 741. He diagnosed lumbosacral

radiculopathy and bilateral hip, pelvic, and knee osteoarthritis. *Id.* He advised Janet to continue

her medications and referred her for a further consult for potential back surgery. *Id.*

On May 5, 2016, Janet returned to Dr. Stephenson at Fauquier Neurological Associates.

*See* R. 721–22. Dr. Stephenson noted that Janet was "still struggling with leg problems along

with low back problems." R. 721 ("80% of the problem is in the legs, 20% [is] in the back"). He

acknowledged some confusion about whether she needed back surgery, explaining that although

Dr. Subach had "more or less" told Janet she did not need back surgery, Janet was "under the

impression that Dr. Smith had indicated that he thought [surgery] was the correct thing to

pursue." *Id.* Dr. Stephenson also noted that Janet still had pain in both legs, walked with a "very

noticeable" limp, and had "knee pain which may need to be addressed in the near future." *Id.* Her

pain was "more prominent now in [her] thighs," and her lower back pain radiated up into the

thoracic region of her back. *Id.* Dr. Stephenson also observed down going toes, diminished deep

tendon reflexes bilaterally ("-1 at the knees, and -1 but present at the ankles"), "mild weakness

proximally in both legs, greater in the left than the right grading 1/2 on the right and -1 on the

left in the iliopsoas and quad," muscle spasms from the lumbar through the lower thoracic

regions, bilateral sacroiliac tenderness, and grossly intact sensation that was reduced in some

areas. R. 722. He noted that Janet did not want to do physical therapy, and he gave her Lyrica

samples because of the prescription drug's high cost. R. 721–22. The next day, Janet returned for

a lower extremity EMG/NCV study. R. 715–17. The NCV results were "within normal limits"

bilaterally. R. 715; *see also* R. 716. The EMG study of Janet's right lower extremity was "normal

except 1-2+ polyphasics in the [right] iliopsoas," and the EMG study of Janet's left lower

extremity was "normal except 2+ polyphasics in the [right] iliopsoas and 1+ polyphasics in the

[left] abductor magnus." R. 716; *see also* R. 715. By contrast, her left paraspinal exam was

"abnormal with increased insertional activity at L3,4 and positive waves at L4[-]5." R. 716. Dr.

Stephenson summarized these results by writing:

> The positive waves in the paralumbar region would suggest [the] possibility of
> L4-5 radiculopathy. There was also increased insertional activity in the L3-4
> region which could also implicate a problem at that level. Both right and left
> iliopsoas as well as the left adductor magnus showed polyphasic changes which
> could reflect back into the L2-3 region. There were, however, no fibrillations or
> positive waves other than that noted at L4-5 in the paraspinal area on the left.

R. 715.

That June, Janet returned to UVA's Neurosurgical Spine Center, for low back and left leg

pain that she said had been "stable" since her December 2015 visit. R. 851. Her back pain was

constant, but it was worst when transitioning from sitting to standing. *Id.* And her lower leg pains

were "intermittent and sharp, running along the lateral thigh and lateral calf" and "occasionally

[running] into the right anteromedial thigh." *Id.* Janet reported left leg weakness, numbness, and

tingling; upper extremity aching and weakness; decreased hand coordination; and balance

problems. *Id.* Erika Roeder, PA-C, observed intact sensation in all extremities, 3+ bilateral upper

extremity reflexes, a 1+ right patellar reflex, absent left patellar and bilateral achilles reflexes, a

grossly normal gait, steady balance, good extremity motor strength, limited ROM, and

lumbosacral and sacroiliac tenderness. R. 853–54. A lumbar X-Ray showed "[m]ultilevel

degenerative disc disease most advanced at L4-L5 and L5-S1 with disc space height loss," R.

955, and a scoliosis X-Ray showed "minimal dextrocurvature of the lumbar spine" that was

"similar" to June 2015 findings, R. 954. A cervical myelogram showed intact surgical fusion and

"[m]ild multilevel degenerative disc changes and moderate facet arthropathy, causing mild to

moderate neuroforaminal stenosis at C3-C4 and C5-C6 on the right," R. 958, and a lumbar

myelogram showed "[d]egenerative disc changes most pronounced at T11-T12, L4-L5, and L5-S1," "facet arthropathy worst in the lower lumbar spine," "[d]isc osteophyte complexes at L4-L5 and L5-S1 causing severe left neuroforaminal stenosis and moderate to severe right neuroforaminal stenosis at both levels," and "[n]o more than mild spinal canal stenosis." *Id.* Also in June, Janet reported that she was no longer able to afford Lyrica because of a change in insurance, and Dr. Stephenson gave her a prescription for gabapentin instead. *See* R. 714.

In October 2016, Janet returned to Dr. McCue. *See* R. 743–45. He observed back spasms/pain and neck DJD; diagnosed lumbosacral radiculopathy and hip, pelvic, and knee osteoarthritis; prescribed tramadol, naproxen, and Phenergan; and referred Janet to rheumatology. R. 744–45. Two weeks later, Janet presented to Nandini Chhitwal, M.D., at Fauquier Health Physician Services, for a rheumatological consultation. R. 746. She complained of psoriasis and neck, lower back, hip, and knee pain. *Id.* Dr. Chhitwal noted that Janet "used to feel better on a combination of [L]yrica and naproxen," but had to discontinue both because she could not afford Lyrica and was told not to take naproxen "because of anemia." *Id.* Janet had tried gabapentin (Neurontin) for "a few days" instead, but she discontinued it because she "didn't like it." *Id.* Dr. Chhitwal observed diffuse spinal tenderness; limited cervical and lumbar ROM; normal paraspinal muscle strength and tone; normal extremities, except for knee crepitus; and scalp psoriasis. R. 749. She also found no evidence of an inflammatory process and explained that Janet's exam was "consistent with" either DJD or osteoarthritis. R. 749. Accordingly, she diagnosed psoriasis; spinal stenosis; cervical, thoracic, and lumbar degenerative disc disease; and DJD of multiple joints. *Id.* She prescribed flector pain patches, recommended pain management, and suggested that Janet try gabapentin or Lyrica again. R. 750.

A week later, Janet presented to Rasheed Siddiqui, M.D., at Charlottesville Pain

Management Center, for low back and lower extremity pain. R. 763–65. Dr. Siddiqui observed a

"slightly antalgic" gait, full lumbar ROM (except extension, which was decreased and painful),

sacroiliac joint tenderness, negative lumbar facet loading maneuvers, full extremity strength,

decreased pinprick sensation along the distal L4-5, and a negative straight leg raise test. R. 764.

He performed a left L4-5 transforaminal epidural steroid injection ("ESI") and recommended

aquatic physical therapy, gabapentin, and exercises. R. 764–65. In November, Janet had a

physical therapy evaluation with Deanna Johnson, P.T., at Culpeper Medical Center. R. 780–83.

She reported back and leg pain that was worse with standing and better with pain medication and

heat. R. 780. PT Johnson observed a "poor" gait; left low thoracic/lumbar paraspinal tenderness;

paraspinal, quadrilateral, and gluteal tightness; lower extremity weakness; and generally good

lower extremity ROM, except in the left knee. R. 781–82. She found that Janet's left knee was

"bone on bone and need[ed] to be replaced." R. 782. She also advised home exercise and listed

multiple potential treatments. *Id.* Also in November, Janet returned to Dr. Siddiqui for another

injection. R. 760–61. He noted substantial, but transient improvement with the prior injection. R.

761. Thus, he performed another transforaminal ESI bilaterally at L4-5. *Id.*

Two days later, Janet returned to Dr. Stephenson and reported that ESIs had not helped

for "more than just a few days at a time." R. 792. Dr. Stephenson noted that Janet was "doing

well" from a "cervical spine stand point"; observed tenderness at L4-5, -1 knee jerks, and intact

ankle jerks; and recommended that Janet have her knee evaluated at UVA. *Id.* That week, Janet

presented to Nicholas Calabrese, PA-C, at UVA Orthopaedics. R. 793–97. She described

"constant," "sharp" knee pain that did not radiate; was located "near the medial and lateral aspect

of the knee"; and affected her daily activities, desired lifestyle, and sleep. R. 793. PA Calabrese

examined Janet's knees and observed no redness or swelling, mild effusion, a correctable five

degree mild valgus deformity, a negative posterior and anterior drawer sign, minimal

varus/valgus laxity, active and passive ROM of zero to 120 degrees, full strength with flexion

and extension, palpable distal pulses, sensation and capillary refill on the lower extremity,

negative Homan's sign, an antalgic gait, lateral joint line tenderness, a negative McMurray's test,

and no crepitus. R. 795. He also reviewed knee X-Rays, which showed "moderate right and

severe left tricompartmental degenerative changes, worst in the lateral compartments, with

subchondral sclerosis and osteophyte formation with mild valgus deformity." *Id.* Accordingly,

PA Calabrese diagnosed osteoarthritis and recommended a total left knee arthroplasty. *Id.*

In January 2017, Janet returned to Dr. Siddiqui, who performed another L4-5 ESI. R.

812–13. And in March, James Browne, M.D., performed a total left knee arthroplasty. *See*

*generally* R. 877–78; R. 975. A month later, Janet returned to Dr. McCue, reporting that her left

knee was "well healed without pain." R. 827. Pain persisted in her left lower back and left thigh,

but Dr. McCue advised against back surgery. *Id.* He diagnosed bilateral knee osteoarthritis and

lumbosacral radiculopathy. R. 828. In June, Janet returned to UVA's Neurosurgical Spine Clinic.

R. 900–03. She reported "relatively stable or slightly improved" symptoms over the prior year.

R. 900. Her "most bothersome symptom" was her low back pain, and although her left leg pain

was somewhat improved since her knee surgery, her legs "just fe[lt] heavy." *Id.* She also

reported right plantar surface pain, left upper extremity weakness, and occasional left finger

numbness. *Id.* She was taking gabapentin and was "doing well with that." *Id.* PA Roeder

observed intact sensation to light touch, absent patellar and achilles reflexes, mild lumbosacral

and sacroiliac tenderness, limited ROM, steady balance, good motor strength in all extremities,

and a grossly normal gait. R. 902–03. PA Roeder recommended conservative treatment and

advised against back surgery. R. 903 (explaining that Janet's lumbar pain was mostly "axial," so surgery was "not favored as a reliable treatment of her pain").

In August, Janet returned to UVA for an evaluation of her right foot pain. R. 904–07. Venkat Perumal, M.D., observed talonavicular and subtalar joint tenderness, "0/55" ankle ROM with knee extended, 2+ dorsalis pedis and posterior tibial ("DP/PT") pulses, intact sensation, and full tendon strength. R. 906. Based on those findings and a foot X-Ray, which revealed "significant [talonavicular] and subtalar joint arthritis" and "mild ankle arthritis," Dr. Perumal ordered a CT scan and recommended ankle surgery. R. 906–07; *see also* R. 983. In September, Janet met with Joseph Park, M.D., also at UVA, for worsening right foot pain. R. 907–10. He noted joint tenderness, 2+ DP/PT pulses, and intact sensation; he referred Janet to physical therapy for a non-weightbearing assessment; and he recommended surgery. R. 910.

In May 2018, Janet returned to UVA's Neurosurgical Spine Clinic for evaluation of increased right-sided low back pain. R. 988. She also had some right leg pain, but it had improved since her left knee surgery. *Id.* PA Roeder observed intact sensation, absent lower extremity reflexes, generally normal motor strength in all extremities, normal ROM, mildly tender right lumbosacral muscles, stiffness upon standing, and an antalgic gait. R. 991. She encouraged physical therapy, pain management, and weight loss. *Id.* In November, Janet returned with medial right knee pain that had "progressed despite attempts at conservative treatment." R. 998–1000. Traci Mahoney, PA-C, observed no redness or swelling, mild effusion, no significant deformities, negative posterior and anterior drawer signs, minimal varus/valgus laxity, zero to 110 degree ROM, 4/5 strength with flexion and extension, palpable distal pulses, sensation, and capillary refill, negative Homan's sign, an antalgic gait, medial joint line tenderness, and crepitus. R. 1000. She diagnosed right knee pain with moderate to severe

16

osteoarthritis; prescribed Celebrex and Voltaren; recommended low impact exercise and weight

loss; and prescribed a hinged knee brace. R. 1000. She also offered a steroid injection, which

Janet declined because injections had not helped her back or ankle in the past. R. 998, 1000.

Also in November, Janet returned to UVA for a follow-up on her right foot pain. *See* R.

1014–18. She reported "right dorsal foot pain and swelling" that had begun about three weeks

earlier. R. 1015. James Shorten, PA-C, observed an antalgic gait; redness, warmth, and swelling;

joint tenderness; intact sensation; unchanged hindfoot valgus; and capillary refill in under two

seconds. R. 1017. He recommended a rheumatology consultation, lab work, ibuprofen,

compression wraps/socks, and a fixed ankle walker. *Id.* Janet was fitted for a fixed ankle walker

the next day, with instructions to wear it "full time." R. 1018–19. A week later, Janet returned to

Dr. Chhitwal, complaining of joint pain that affected her right leg, buttock, and knee and made

walking difficult. R. 1021. Dr. Chhitwal also noted a long history of psoriasis and observed skin

lesions on Janet's scalp, ears, and finger, as well as right knee and foot swelling and tenderness.

R. 1021–22. Accordingly, she diagnosed psoriatic arthritis, prescribed a prednisone taper, and

ordered labs and a chest X-Ray "in anticipation of starting [Janet] on methotrexate." *Id.*

    *2.   Medical Opinions*

In November 2014, on initial review for DDS, Joseph Familiant, M.D., opined that Janet

could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; she

could stand/walk and sit for about six hours each in an eight-hour workday; she was limited in

her ability to push and pull with both lower extremities; she could occasionally climb ramps,

stairs, ladders, ropes, and scaffolds; she could occasionally stoop, kneel, crouch, and crawl; she

was not limited in her ability to balance; and she had no manipulative, visual, communicative, or

environmental limitations. R. 115–16. Dr. Familiant observed that Janet's limitations were

"secondary to back and knee pain and obesity," noted that she had degenerative changes, pain, and limited range of motion in her knees, noted that she had a wide-based antalgic gait in November 2014, and concluded that her daily activities "indicated good endurance" with standing/walking and no need for an assistive device. R. 115. On reconsideration in May 2015, Carolina Bacani-Longa, M.D., made somewhat more restrictive findings. *See* R. 127–29. She opined that Janet could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; she could stand/walk for about four hours in an eight-hour work day and could sit for about six hours in an eight-hour workday; she was limited in her ability to push and pull with both lower extremities; she could occasionally climb ramps/stairs, but could never climb ladders/ropes/scaffolds; she could occasionally balance, stoop, kneel, and crouch, but could never crawl; and she needed to avoid concentrated exposure to hazards such as machinery and heights. R. 128–29. Dr. Bacani-Longa explained that she restricted Janet's exertional capacities, including the four-hour limitation on standing/walking,  "due to multilevel degenerative changes [in Janet's] lumbar spine, grade 4 osteoarthritis [in the] left knee, grade 3 osteoarthritis [in the] right knee, obstructive sleep apnea, obesity, hypertension, colitis, and history of psoriasis." *See* R. 128. She also wrote: "[p]ush/pull limited to occasional bilateral knees." *Id.*

   3.    *Janet's Statements*

   In October 2014, Janet submitted a Function Report to DDS. *See* R. 350–57. She explained that her days consisted of housework, bookkeeping, and errands. R. 350. She cared for her husband by washing his clothes, cooking, and taking care of the house. R. 351. She also cared for her dogs and horses, but her husband did "any heavy lifting or other maintenance." *Id.* She endorsed pain and fatigue, which made it hard to handle personal care. *Id.* She had "to be sitting to put pants and shoes on," and she had pain when stepping into the shower, standing to

wash dishes, and walking up and down stairs. *Id.* Janet made sandwiches for lunch and "one

course meals for supper." R. 352. She cooked dinner about five days a week, which took "about

30 minutes or less," and she sometimes had to rest while the food cooked. *Id.* She also went out

to eat "on occasion." *Id.* Janet did laundry daily, shopped for groceries once or twice a week, and

swept and dusted about three times a week. *Id.* She was no longer able to mow her grass with a

riding mower. *Id.* Janet went outside every day and drove independently to get groceries, pet

supplies, and clothes about two to three times a week. R. 353. She noted that although she went

out on her own, she did "fall on occasion–usually at the barn." *Id.* Janet enjoyed reading,

watching television, riding her horse, and caring for her horses and dogs. R. 354. She explained

that she was an "accomplished equestrian" and that she rode her horse about "1–4 times a week"

when the weather was nice, "for short periods," and "only [did] gentle slow classical dressage

work/riding." *Id.* She needed steps to climb onto the horse, she did not jump or gallop, and she

did not ride in cold, damp weather because it made her "hurt too much" to ride. *Id.* For social

activities, Janet went to lunch with her friends, talked on the phone, and spent time with friends

and family. *Id.* She also explained that she "[n]ever had any social activities unless it was riding

[horses] with someone else," and she did "very little of that now." R. 355. She went to town

about four times a week for shopping and farm-related tasks. R. 354. Finally, Janet endorsed

difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair

climbing, memory, completing tasks, concentration, and getting along with others. R. 355. She

estimated that she could lift fifty pounds once or twice "but only to [her] hips," could not squat

or kneel because of leg and knee pain, could bend "a few times," could stand unassisted for

about five to ten minutes, and could not reach over her head repeatedly without experiencing

neck and upper back pain. *Id.* She explained that she could walk from her house to her barn and

back "several times a day," which was "about 1,000 feet," and she "usually" leaned on a shopping cart when walking in stores. *Id.* She also took "a portable seat/walking stick" with her when she knew she "might have to stand somewhere for a while," R. 356, and she could not "sit still for more than 5–10 min[utes]" without shifting or leaning forward, R. 357.

At her first administrative hearing before ALJ Mates in December 2016, Janet testified that she had severe lower back and leg pain and that her condition had worsened since she submitted her Function Report to DDS. R. 38, 55–56. She explained that she could stand for "no more than five minutes," walk for ten minutes, and sit upright comfortably for about ten to fifteen minutes. R. 42–43. She could not squat or lift more than twenty pounds. R. 44. She had taken Lyrica and naproxen in the past, but she had to discontinue Lyrica because she could not afford it, R. 43, 56, and her doctor ordered her to stop taking naproxen because of anemia, R. 43; *see also* R. 39–40 (reporting that she was now taking gabapentin for pain and chloroxazone for muscle relaxation). Janet reported "severely worse" symptoms since discontinuing Lyrica and naproxen. R. 43. Personal care and housework had become "very difficult," she could not go shopping if she couldn't "lean on a cart" while in the store, and she was "in misery" if she had to "stand in line." R. 45–46. She could no longer ride horses, and "the only thing" she did to care for them was walk to her barn and give them water. R. 52–54 (explaining that she could not "do enough walking to even be able to get . . . one [of her horses] ready to ride"). Janet also explained that she had a neck surgery in July 2015 and that she anticipated having both knee and back surgery in the future. R. 47–48. She explained that she had been diagnosed with bilateral knee pain and degenerative arthritis in her right knee and that November 2016 knee X-Rays showed that her "left knee was really bad and that the right knee was a little better but still bad enough to need surgery." R. 49–50. She expected to have left knee surgery in February 2017 and

right knee surgery at some point thereafter. R. 50. She also had pain in her back since she was

thirteen years old, could no longer "do anything" because of it, and expected to have a future

lumbar surgery. R. 50–51.

At her second administrative hearing before ALJ Munday in December 2018, Janet

reported worsening symptoms. *See* R. 76–101. She had six injections in her back, but none of

them provided lasting relief. R. 86. Her doctor recommended lumbar fusion surgery and told her

that she had "nerve damage from nerve impingement," but she tentatively decided not to have

surgery. R. 86–87 (explaining that she did not want to have back surgery unless her leg started

"to get worse" because of the "the potential for [a] bad outcome"). Janet also explained that she

began to realize that her left knee was "in pretty bad shape" in 2013 or 2014. R. 89. She had knee

surgery, which made her left knee "significantly better." R. 89–90. At the same time, her right

knee was "starting to give [her] trouble," which she suspected was because of arthritis. R. 90.

She reported that she could not be on her feet for four hours per day because she "would get

shaky," would be in pain, and "would have to sit down." R. 92. She participated in no activities

outside the home, went out to dinner about twice a week "to keep [her] from having to cook,"

could no longer keep up with housework and bookkeeping, and could no longer ride horses. R.

94–95, 98. She could sit comfortably for only ten to fifteen minutes because of neck and back

pain. R. 100. At home, she sat in a "power recliner" so that she could "constantly" change

position. R. 101. Janet also endorsed balance problems, falls, and hand/finger weakness. R. 87–

88. Finally, Janet explained that her pain had affected her ability to perform her job duties as a

school nurse, particularly in her last six months to a year of working. R. 77; *see* R. 83 (testifying

that she stopped working as a school nurse in June 2014). She became "slow" in responding to

medical emergencies around the school building, so other employees began "just bringing

students" to her office instead of calling her for help. *Id.* She still walked around the building as needed at times, R. 78–79, but she primarily sat in her office until she needed to care for a student, R. 80.

B.    *The ALJ's Decision*

ALJ Munday summarized most of this evidence in her written decision addressing the relevant time between June 30, 2014, the date Janet allegedly became disabled, and March 13, 2019, the date ALJ Munday issued her partially favorable decision. *See* R. 17–23. She found that Janet's degenerative disc disease, DJD, and obesity qualified as "severe" impairments during this time, R. 17, and that those impairments "could reasonably be expected to cause the alleged symptoms"[9] that Janet described, R. 21. ALJ Munday then made two credibility findings in assessing Janet's RFC during the relevant time: one for the period before May 5, 2016, and one for the period on and after that date. *See* R. 19–21. The differing credibility findings led ALJ Munday to conclude that Janet could perform "light" work before May 5, 2016, but that she was subsequently limited to "sedentary" work. R. 19, 21.

In concluding that Janet could do light work, ALJ Munday found that Janet's statements describing the intensity, persistence, and limiting effects of her symptoms were "not fully supported prior to May 5, 2016," R. 21, primarily because they were "inconsistent with the findings on examination and diagnostic testing and her conservative treatment prior to May 5, 2016," R. 20. "Specifically," ALJ Munday stated that although Janet's treatment notes showed that she was obese and had "multilevel degenerative disc disease" and "L5-S1 radiculopathy" since 2014, physical examinations showed that she "just had some tenderness and spasms in her spine and reduced lumbar spine range of motion." R. 20. She further stated that Janet "had no significant gait abnormalities, other than an antalgic gait"; had "intact strength and sensation in

_____

[9] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. § 404.1502(i).

her extremities on repeated examination," except in May and June 2015; and had been "treated conservatively for her back pain, with medications and physical therapy." *Id.* She also stated that although the record evidenced osteoarthritis in Janet's bilateral knees, she "just had some swelling and tenderness in her knees on repeated exams and was treated only conservatively for her pain prior to May 2016." *Id.* And she noted that Janet "did not complain of arm and neck pain until January 2015," "reported doing well" in September 2015 after a neck surgery, and did not require follow up for "either her spinal or knee impairments" from September 2015 until May 2016. *Id.* (citing Exs. 1F, 2F, 4F, 5F, 10F, 13F, 17F, 18F). Finally, ALJ Munday explained that Janet's reported daily activities were "inconsistent with the evidence of record," noting that she "continue[d] riding her horses until the summer of 2015" and helped make bank deposits and pay bills for her family's farm. R. 20–21 (citing R. 571). ALJ Munday also considered the medical opinions of record as part of the pre-May 5, 2016 RFC assessment. R. 21. She rejected Dr. Bacani-Longa's May 2015 opinion restricting Janet's "walking and standing [to] 4 hours" because it was not "consistent with the evidence of record prior to May 5, 2016, particularly the claimant's lack of a need for an assistive device and her lack of ongoing lower extremity weakness or strength deficits since her [alleged] onset date." *Id.*[10]

---

[10] Janet argues that ALJ Munday improperly discounted Dr. Bacani-Longa's opinion limiting her to walking and standing for four hours in an eight-hour workday. *See* Pl.'s Br. 13–16. I agree. Because Janet's first argument alone requires remand, I do not discuss ALJ Munday's evaluation of the medical opinion evidence in detail. But it suffices to note that ALJ Munday's reasons for discrediting Dr. Bacani-Longa's opinion—Janet's lack of an assistive device and "lack of ongoing lower extremity weakness or strength deficits since her onset date"—are not supported by substantial evidence. Janet did not have an assistive device and generally had full lower extremity strength on examination. *See* R. 449, 560–61, 576, 667–68. But, as explained further herein, her providers repeatedly identified other objective indicators that *did* suggest significant lower extremity impairments throughout the relevant period. *See, e.g.*, R. 439–40, 449, 454, 481, 513, 539–40, 576, 667–68, 692. ALJ Munday's evaluation of Dr. Bacani-Longa's opinion improperly ignored those findings. *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding."). Accordingly, on remand, the Commissioner must reevaluate the medical opinions based on the record as a whole, as required by the regulations. *See* 20 C.F.R. § 404.1527(c).

In concluding that Janet was limited to sedentary work after May 5, 2016, ALJ Munday found that "beginning on May 5, 2016, the claimant's allegations regarding her symptoms and limitations are consistent with the evidence." R. 21. ALJ Munday then wrote:

> This evidence reveals that on May 5, 2016, she was seen by her neurologist and was noted to have pain in both legs and to be walking with a noticeable limp. She also had diminished reflexes of -1 at the knees; weakness in both legs, greater in left than right, grading ½ on the right and -1 on the left in the iliopsoas and quad; muscle spasms from the lumbar through lower thoracic region and some reduced sensation . . . An EMG/NC[V] also revealed possible L3-L5 radiculopathy and that both right and left iliopsoas as well as the left adductor magnus showed polyphasic changes, which could reflect back into the L2-3 region.

R. 21–22 (citing R. 715–18, 721–22). ALJ Munday also noted that there were similar abnormal findings on Janet's June 2016 examination findings ("3+ bilateral upper extremity reflexes, 4-5/5 strength in her shoulder, 4/5 strength in the hip flexors and EHL and tenderness in the lumbosacral and [sacroiliac] region with limited range of motion"); that Janet "began receiving pain management treatment" in October 2016, where she "was noted to have increased pain with walking and sensory loss in the left leg with some weakness at times, a slightly antalgic gait and pain with cervical range of motion"; that she had steroid injections at L4-L5 in October and November 2016; that X-Rays taken in the fall of 2016 revealed "severe degenerative joint disease of the left knee and moderate degenerative joint disease on the right," which prompted Janet to undergo a total knee replacement in March 2017; that she was diagnosed with "severe osteoarthritis of the right foot" in August 2017; and that she was diagnosed with psoriasis with arthropathy, observed with right knee and foot tenderness and swelling, found to have severe degenerative changes in and a large joint effusion in the right knee, and prescribed a fixed ankle walker in November 2018. R. 22. Finally, ALJ Munday discounted both of the DDS physicians' medical opinions about Janet's exertional capacities, giving them "little weight" because they were "inconsistent with the evidence received since May 5, 2016, which reveals that the claimant

24

is further limited to sedentary work as her knee pain increased and she now requires a fixed

ankle walker for ambulation." *Id.*

Based on these RFC findings, ALJ Munday concluded that Janet could perform her past

relevant work as a school nurse before May 5, 2016, and was thus "not disabled" before that

date. R. 22–23. By contrast, ALJ Munday determined that Janet could no longer perform her past

relevant work as of May 5, 2016, and was thus "disabled" under Medical-Vocational Rule

201.06 as of that date. R. 24.

C.    *Analysis*

Janet argues that ALJ Munday failed to adequately explain how she determined that Janet

was "not disabled" on May 4, 2016, but was "disabled" as of May 5, 2016. *See* Pl.'s Br. 14. I

agree.

When an ALJ determines, based on her RFC[11] finding, that an individual is disabled, she

"must also establish the onset date of disability." SSR 83-20, 1983 WL 31249, at *1 (Jan. 1,

1983). For disabilities of nontraumatic origin, "the determination of onset involves consideration

---

[11] A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary
work setting" for eight hours a day, five days a week despite her medical impairments and related
symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding
"made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F.
App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "functional
limitations or restrictions caused by medical impairments and their related symptoms," including pain,
that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996
WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*,
7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va.
Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to determine whether an alleged
symptom or functional limitation is supported by or consistent with other relevant evidence, including
objective evidence of the underlying medical impairment, in the claimant's record. *See Hines*, 453 F.3d at
564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing
*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the
ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal
standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and she built
an "accurate and logical bridge from that evidence to [her] conclusion," *Woods v. Berryhill*, 888 F.3d 686,
694 (4th Cir. 2018) (quotation marks and other brackets omitted). *See Thomas v. Berryhill*, 916 F.3d 307,
311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017).

of the applicant's allegations, work history, . . . and the medical and other evidence concerning impairment severity." *Id.* at *2. The "starting point" in this analysis is the claimant's alleged onset date. *Id.* If disability as of the alleged onset date is "consistent with all the evidence available," the ALJ must find the claimant disabled as of that date. *Id.* at *3. In some cases, the ALJ may need to infer a different disability onset date by considering the medical and other evidence and making "an informed judgment of the facts in the particular case." *Id.* at *3–4. "This judgment, however, must have a legitimate medical basis." *Id.* at *3. Thus, when "the evidence of onset is ambiguous," *Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995); *see also Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 345 (4th Cir. 2012), the ALJ "should call on the services of a medical advisor" to testify at the claimant's administrative hearing, SSR 83-20, 1983 WL 31249, at *3. At bottom, the established disability onset date should be the date on which "it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." *Id.* A "[c]onvincing rationale must be given for the date selected." *Id.*

Here, ALJ Munday found a May 5, 2016 disability onset date without "call[ing] on the services of a medical advisor" or providing a "[c]onvincing rationale" for her conclusion. *Id.* Indeed, ALJ Munday's only rationale was that she accepted as credible Janet's subjective allegations "beginning on May 5, 2016," but that she discounted those same allegations for the first part of the relevant period, i.e., June 30, 2014 through May 4, 2016. R. 21. She independently determined, without adequate explanation, that Janet's statements about the severity of her symptoms were "consistent" with the record as of May 5, 2016, and that Janet was limited to "sedentary," as opposed to "light," work as of May 5, 2016. *See* R. 19–22. The

change from a "light" RFC to a "sedentary" RFC is significant. An individual who can perform "light" work can stand/walk up to six hours in an eight-hour workday. *Neal*, 2010 WL 1759582, at *2. By contrast, an individual who is limited to "sedentary" work can stand/walk for only about two hours in an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3. Had ALJ Munday found that Janet was limited to "sedentary" work beginning on her June 30, 2014 alleged onset date, then she would have been entitled to disability benefits for the entire relevant period. *See* R. 23–24, 76, 109; 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.06.

ALJ Munday attempted to distinguish between Janet's pre- and post-May 5, 2016 condition by referencing Janet's May 5, 2016 visit with Dr. Stephenson and lower extremity EMG/NCV results. *See* R. 21–22 (citing R. 715–18, 721–22). She explained that during this visit Dr. Stephenson noted Janet had "pain in both legs," observed she was "walking with a noticeable limp," and identified "diminished reflexes of -1 at the knees," "weakness in both legs, greater in left than right," "grading ½ on the right and -1 on the left in the iliopsoas and quad," "muscle spasms from the lumbar through lower thoracic region," and "some reduced sensation." R. 22. She also explained that Janet's lower extremity EMG/NCV study "revealed possible L3-L5 radiculopathy and that both right and left iliopsoas as well as the left adductor magnus showed polyphasic changes, which could reflect back into the L2-L3 region." *Id.* ALJ Munday also supported her post-May 5, 2016 RFC finding by referencing June 2016 examination findings, Fall 2016 pain management treatment, Janet's March 2017 left knee surgery, August 2017 treatment notes, and Janet's November 2018 fixed ankle walker prescription. R. 22. This discussion of medical evidence from the two years following the date the ALJ determined Janet was disabled does not adequately explain why she chose May 5, 2016 as Janet's disability onset date.

Dr. Stephenson's May 5, 2016 observations and test findings may support ALJ Munday's finding that Janet was limited to sedentary work as of that date. But I am unable to determine why ALJ Munday did not find Janet to be so limited *before* May 5, 2016. Nothing in the record suggests that Janet's symptoms, examination findings, diagnosis, or treatment materially changed in any way as of May 5, 2016. ALJ Munday suggests that the objective findings were not significant prior to May 5, 2016, *see* R. 20, but that suggestion is not supported by the record. Instead, the record shows that Janet consistently complained of back and leg pain since at least 2013 and that her providers regularly observed abnormalities in those areas. *See, e.g.*, R. 439–40, 448–49, 454–55, 462, 472–73, 494, 500–02, 503, 509–11, 537–41, 559–61, 576, 613, 617, 623–24, 667–68, 692–93, 724–25, 734–35, 740–41. As early as June 2014, a left knee X-Ray showed osteoarthritis and joint effusion. R. 454–55, 481. In July 2014, lower-extremity EMG/NCV results were "abnormal" and revealed "moderate chronic denervation of the left L5 and S1 nerve root innervated muscles," "no evidence of acute denervation in the lower limbs," and decreased achilles and patellar reflexes. R. 448–49. And at an orthopedic evaluation in November 2014, Dr. Engh conducted a knee evaluation; identified an antalgic gait, limited range of motion, and other abnormal findings; diagnosed degenerative arthritis of the knees; and recommended a left total knee replacement. R. 539–40. Janet did not return to Dr. Engh, and treatment notes suggest that she could not afford visits to his clinic because it would not accept her health insurance. *See* R. 721. But her other providers continued to regularly observe abnormal lower back, leg, and knee findings. *See* R. 560–61 (observing decreased patellar and achilles reflexes (Jan. 2015)); R. 575–76 (observing a positive left straight leg raise test and right greater than left deep tendon reflexes (Jan. 2015)); R. 667–68 (observing decreased patellar and achilles reflexes, good to full lower extremity strength, and knee pain) (June 2015)); R. 723 (noting Janet continued to report leg pain

(Sept. 2015)); R. 692 (observing antalgic gait and pain limited left knee extension (Dec. 2015));

R. 741 (diagnosing lumbar radiculopathy and knee, hip, and pelvic osteoarthritis (Feb. 2016));

*but see* R. 725 (observing "normoactive" lower extremity reflexes (Apr. 2015)). Accordingly, I

cannot find that substantial evidence supports ALJ Munday's assessment that May 5, 2016,

marked a change in Janet's condition. *See Steele v. Astrue*, No. 5:07cv703, 2009 WL 899424, at

*11 (S.D. W. Va. Mar. 31, 2009) (remanding where ALJ found claimant disabled as of July 17,

2005, despite "consistent" medical evidence documenting left knee impairments "before and

after" that date).

ALJ Munday acknowledged some of Janet's abnormal pre-May 5, 2016 examination

findings, but she minimized their significance without adequate justification. *See* R. 20 (noting

before May 5, 2016, Janet had "no significant gait abnormalities, other [than] an antalgic gait"

and "on repeated examinations prior to May 2016, . . . she just had some tenderness and spasms

in her spine and reduced lumbar spine range of motion"). This was improper. *See* SSR 83-20,

1983 WL 31249, at *2–3 ("[T]he established onset date must be fixed based on the facts and can

never be inconsistent with the medical evidence of record."); *Kellams v. Berryhill*, 696 F. App'x

909, 912 (10th Cir. 2017) ("[A]n ALJ cannot mischaracterize or downplay evidence to support

his findings."); *Rios v. Colvin*, No. 1:13cv1458, 2015 WL 1258908, at *9 (E.D. Va. 2015)

(remanding where ALJ stated that "the documented objective findings discount [the claimant's]

credibility" but failed to "sufficiently explain how the objective findings affirmatively detract

from [her] credibility").

Two other points also warrant brief discussion. First, ALJ Munday inaccurately stated

that Janet "did not require any follow-up treatment again, for either her spinal or knee

impairments" from September 2015 through May 2016. R. 20. This is incorrect. Janet presented

to Dr. Smith in December 2015 and complained of "lower back" and "lower extremity pain." R. 692. Dr. Smith noted that Janet's lower extremity pain had temporarily improved after her neck surgery, but had since "returned with a vengeance"; identified an antalgic gait; and provided options for lumbar surgery. R. 692–93. Janet also followed up with Dr. McCue in February 2016 for back pain, *see* R. 740, on which occasion Dr. McCue observed back spasms and pain and diagnosed lumbosacral radiculopathy and hip, pelvic, and knee osteoarthritis, R. 741. Second, ALJ Munday referenced post-May 5, 2016 findings and treatment to support her conclusion that Janet was disabled as of May 5, 2016. *See, e.g.*, R. 22 (discounting DDS medical opinions because they were "inconsistent with the medical evidence received since May 5, 2016, which reveals that the claimant is further limited to sedentary work as her knee pain increased and she now requires a fixed ankle walker for ambulation"). These findings do not explain why ALJ Munday chose May 5, 2016, as Janet's disability onset date. Treatment from late 2016, 2017, and 2018 may show that Janet continued to have significant leg and back impairments through 2018 and lasted for more than twelve months, but it does not explain why ALJ Munday found Janet disabled as of May 5, 2016.

*

I take no position on whether Janet is entitled to disability benefits. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d at 869. Because there is no meaningful difference in Janet's symptoms, examination findings, diagnosis, or treatment before and after May 5, 2016, ALJ Munday's selection of May 5, 2016 as Janet's disability onset date was arbitrary. ALJ Munday impermissibly discounted the pre-May 5, 2016 objective evidence without explanation, cited Dr. Stephenson's May 5, 2016 findings without explaining how they were materially different from prior findings, and cited, without explanation, post-May 5, 2016

evidence to support her conclusion that Janet was disabled beginning on May 5, 2016.

Accordingly, I cannot find that her decision is supported by substantial evidence. On remand, the

Commissioner must reassess Janet's disability onset date in accordance with SSR 83-20;

reevaluate the medical opinions of record; consider and apply the applicable legal rules to all the

relevant evidence in the record; explain how any material inconsistencies or ambiguities were

resolved at each critical stage of the determination; and, assuming Janet cannot prove she is

disabled based on the medical evidence alone, provide a logical link between the evidence the

Commissioner found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** Janet's Motion for Summary Judgment, ECF No. 8, **DENY** the Commissioner's

Motion for Summary Judgment, ECF No. 12, **REVERSE** the Commissioner's final decision,

**REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case

from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 24, 2021

Joel C. Hoppe
United States Magistrate Judge